## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MARCIA L. MCGOWAN and TRACI M.
SINGER, individually and on behalf
of all others similarly situated,

      Plaintiffs,

      v.

BARNABAS HEALTH, INC.; THE
INVESTMENT COMMITTEE OF
RWJBARNABAS HEALTH, INC.; THE
DEFINED CONTRIBUTION PLANS
AND ERISA ADMINISTRATIVE
SUBCOMMITTEE OF THE
INVESTMENT COMMITTEE OF
RWJBARNABAS HEALTH, INC.
SYSTEM; and JOHN DOES 1–30,

      Defendants.

Civ. No. 20-13119 (KM) (ESK)

**OPINION**

__KEVIN MCNULTY, U.S.D.J.__:

      Marcia McGowan and Traci Singer (the "Participants") participated in retirement plans (the "Plans") offered by their employer, Barnabas Health, Inc. The Participants allege that Barnabas and committees to which Barnabas delegated plan management (collectively, the "Fiduciaries") failed to invest prudently and lower costs. The Participants, on behalf of themselves and a putative class, sue the Fiduciaries, asserting claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The Fiduciaries move to dismiss for lack of standing or failure to state a claim. (DE 18.)[1] For the following reasons, the motion is **DENIED**.

---

[1]     Certain citations to the record are abbreviated as follows:

    DE = docket entry

    Compl. = Complaint (DE 1)

    Mot.  = Fiduciaries' Brief in Support of their Motion to Dismiss (DE 18-1)

## I.   BACKGROUND

### A. Facts

Barnabas is "New Jersey's largest integrated health care delivery system," with tens of thousands of employees. (Compl. ¶ 21.)[2] For these employees, Barnabas created and sponsored retirement-savings plans. (*Id.* ¶¶ 21, 36–37.) The Plans are "defined contribution" plans, meaning that participants invest a set contribution (often a percentage of each paycheck) in investment funds offered by the Plans. The eventual payout will vary depending on the performance of the investments. (*Id.* ¶ 37, 40.) The Plans provided various investment options, mostly mutual funds. (*Id.* ¶ 46.) The Participants invested in some of those options. (*See id.* ¶¶ 17–19.)

Barnabas formed an Investment Committee "responsible for the prudent selection and monitoring of the funds in the Plans." (*Id.* ¶ 27.) The Investment Committee further delegated its responsibilities to an Administrative Committee that has been mostly responsible for plan administration. (*Id.* ¶¶ 31–32, 119.) The Fiduciaries, the Complaint alleges, failed to adequately manage the Plans' investment funds. (*Id.* ¶¶ 63, 119.) Those alleged failures, the Participants allege, fall into two categories: high-cost investments and excessive recordkeeping expenses.

#### 1. High-Cost Investments

First, the Participants allege that the Fiduciaries selected high-cost investments when lower-cost alternatives were available. (*Id.* ¶ 65.) This allegedly occurred in three ways.

First, the Fiduciaries selected and maintained funds with high expense ratios. Investments charge a fee for management and other administrative services. (*Id.* ¶ 67.) For investments like mutual funds, the cost to retirement-plan participants is reflected in the fund's expense ratio, which is a percentage

---

Opp. = Participants' Brief in Opposition to the Motion to Dismiss (DE 25)

[2]     Barnabas merged with the Robert Wood Johnson Health System in 2016. (Compl. ¶ 36.)

of assets that goes to administration. (*Id.*) For example, an expense ratio of .75% means that the participant will pay $7.50 annually for every $1,000 in assets. (*Id.*) The expense ratio also reduces the participant's return, an effect that can be multiplied by compounding. (*Id.*) Large investors, like the Plans, can often use their size as leverage to secure lower expense ratios. (*Id.* ¶ 68.) The Participants allege that many of the funds in the Plans had expense ratios above the median for similarly sized plans. (*Id.* ¶¶ 71–75.)

Second, the Fiduciaries allegedly could have used lower-cost share classes. Many mutual funds offer multiple classes of shares in a single mutual fund, with varying fees. (*Id.* ¶ 76.) More expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are available to institutional investors with more assets. (*Id.*) Given the Plans' size, the Complaint alleges, the Fiduciaries should have invested in the cheapest share classes available. (*Id.* ¶ 77.) The Complaint points to more than a dozen investments by the Plans for which a lower-cost share class was available. (*Id.* ¶ 80.)

Third, and finally, the Participants allege that there were lower-cost alternative funds that performed better long-term. (*Id.* ¶ 92.) The Complaint points to ten specific alternatives that had better 3- and 5-year average returns. (*Id.* ¶ 96.)

### 2. Recordkeeping Expenses

The Participants allege that the Fiduciaries failed to monitor or control the Plans' recordkeeping expenses. "Recordkeeping" refers to administrative services provided by the plan's designated "recordkeeper." (*Id.* ¶ 102.) Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. (*Id.* ¶ 103.) Recordkeeping expenses can either be paid from plan assets or by the plan's investments *via* a practice known as revenue sharing. (*Id.* ¶ 104.) Revenue sharing, however, can mask high fees. (*Id.* ¶ 105.)

The Plans' recordkeeper was Fidelity. (*Id.* ¶ 101.) Fidelity charged a flat 0.09% of total plan assets annually, assessed against participants on a pro rata basis. (*Id.* ¶ 106.) Allowing Fidelity to charge this fee and to use revenue sharing to pay for it was unnecessary, according to the Participants, because the Fiduciaries could have bargain for a lower per participant/per capita fee as other large plans have done with Fidelity. (*Id.* ¶ 109.)

### B. Procedural History

Based on these alleged failures, the Participants sued the Fiduciaries. They assert two claims: (1) breaches of fiduciary duties of loyalty and prudence, in violation of ERISA, 29 U.S.C. § 1104(a), asserted against the Administrative Committee; (2) failure to monitor the Administrative Committee, in violation of ERISA, asserted against Barnabas and the Investment Committee. (Compl. ¶¶ 118–31.) The Participants seek to represent a class of "participants in or beneficiaries of the Plans, at any time between September 23, 2014 through the date of judgment." (*Id.* ¶ 49.) The Fiduciaries move to dismiss the complaint for lack of standing, pursuant to Fed. Civ. P. 12(b)(1), or for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). (Mot.)

## II.   STANDARDS OF REVIEW

### A. Standing

Under Rule 12(b)(1), a defendant may move to dismiss on the grounds that the court lacks subject-matter jurisdiction over the dispute. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion is the vehicle for a motion to dismiss for lack of standing. *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014). A Rule 12(b)(1) attack can be facial where the defendant "attacks the complaint on its face without contesting its alleged facts." *Hartig Drug Co. v. Senju Pharms. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). In such a case, the court considers only the allegations of the complaint and documents referred to therein, construed in the light most favorable to the plaintiff. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Alternatively, a Rule 12(b)(1) attack can be factual where the defendant "attacks allegations underlying the

assertion of jurisdiction in the complaint." *Hartig*, 836 F.3d at 268 "[W]hen reviewing a factual challenge, "a court may weigh and consider evidence outside the pleadings," and the plaintiff bears the burden of showing that jurisdiction exists. *Id.* (quoting *Aichele*, 757 F.3d at 358).

### B. Failure to State a Claim

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations but "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

### III.   DISCUSSION

This is an ERISA case. ERISA imposes certain duties on those who manage employee benefit plans (fiduciaries), with the purpose of protecting participants and beneficiaries. *Sweda v. Univ. of Penn.*, 923 F.3d 320, 327 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020). When fiduciaries breach those duties, ERISA provides a cause of action for participants or beneficiaries to sue on behalf of the plan. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 773 (2020); *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985).

The Participants allege certain breaches here. I first address the Fiduciaries' argument that the Participants lack standing for some of their claims. (Section III.A.) I then address the alleged breaches of the duties of prudence (Section III.B), loyalty (Section III.C), and monitoring (Section III.D).

## A. Standing

The Fiduciaries question the Participants' standing. (Mot. at 26–28.) Because standing is a prerequisite to my jurisdiction, I address it first. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). To establish standing, a plaintiff must allege an injury that is traceable to the defendant and redressable by the suit. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021).

The Fiduciaries argue that the Participants invested in only some of the funds cited, and that they lack standing to press claims based on the funds in which they did not invest. (Mot. at 28.) That is, the Complaint names certain funds and compares them to lower-cost alternatives (Compl. ¶¶ 72, 73, 80, 82, 94), but the Fiduciaries say that the Participants did not invest in all those named funds. It follows, the Fiduciaries say, that the Participants cannot assert claims based on the funds in which they did not invest.[3]

The Fiduciaries rely on two cases, *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615 (2020), and *Perelman v. Perelman*, 793 F.3d 368 (3d Cir. 2015). In those cases, the Supreme Court and Third Circuit held that participants in a defined-benefit plan lacked standing to bring ERISA claims because the payments to which they were entitled were fixed. *Thole*, 140 S. Ct. at 1628; *Perelman*, 793 F.3d at 374. As a result, they did not stand to gain monetarily from a suit that would force the plans to invest differently. *Id.* Reasoning from *Thole* and *Perelman*, the Fiduciaries argue that the Participants do not stand to gain from a judicial order to manage certain funds differently if the Participants never invested in those funds to begin with.

This stretches *Thole* and *Perelman* too far. Indeed, the *Thole* Court explicitly distinguished the case of a defined-contribution plan, like the one here. The Court explained that, for a defined-benefit plan, "benefits are fixed

---

[3]    The Fiduciaries provide evidence to this effect (DE 18-2, -3), and the Participants do not dispute that they did not invest in all individual funds referenced in the Complaint (Opp. at 33).

and will not change, regardless of how well or poorly the plan is managed." 140 S. Ct. at 1620. "By contrast, in a defined-contribution plan, . . . retirees' benefits are typically tied to the value of their accounts, and the benefits can turn on the plan fiduciaries' particular investment decisions." *Id.* at 1618. Thus, *Thole* suggested that management decisions *will* impact participants in a defined-contribution plan. Because such participants stand to gain or lose from the manner in which the funds are invested and managed, they have standing—at least as to the particular investment funds in which their money was invested.

That reasoning leaves out the case of funds in which the Plans were invested, but the individual plaintiffs were not. *Thole* suggests—concededly, "holds" would be too strong—that a plaintiff has standing to sue on behalf of the Plan, even if that particular plaintiff was not invested in each one of the Plan's investment vehicles. The *Thole* plaintiffs attempted to "assert standing as representatives of the plan itself." *Id.* at 1620. But generally, of course, "in order to claim the interests of others, the litigants themselves still must have suffered an injury in fact." *Id.* (quotation marks and citation omitted). That is the case here.

*Step one*: The Participants have alleged an injury to *their own* investments by virtue of the Fiduciaries' mismanagement, sufficient to create a case or controversy for Article III purposes. *Step two*: ERISA then grants the Participants a cause of action to sue on behalf of the Plans. 29 U.S.C. § 1132(a)(2). So it follows that "a plaintiff with Article III standing" may sue on behalf of the Plan and "may seek relief under § 1132(a)(2) that sweeps beyond [that plaintiff's] own injury." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009); *cf. Thole*, 140 S. Ct. at 1620–21 (plaintiff must establish Article III injury before it can sue under § 1132(a)(2)).

Courts post-*Thole* have generally rejected the argument that a plaintiff's ERISA challenge must be confined to the individual funds in which he or she invested. *Cates v. Trs. of Columbia Univ.*, No. 16 Civ. 6524, 2021 WL 964417, at

*2 (S.D.N.Y. Mar. 15, 2021); *Parmer v. Land O'Lakes, Inc.*, Civ. No. 20-1253, 2021 WL 464382, at *3 (D. Minn. Feb. 9, 2021); *Kurtz v. Vail Corp.*, --- F. Supp. 3d ----, ----, No. 20-cv-500, 2021 WL 50878, at *6 (D. Colo. Jan. 6, 2021); *Silva v. Evonik Corp.*, Civ. No. 20-2202, slip op. at *3 n.3 (D.N.J. Dec. 30, 2020), DE 25; *Boley v. Univ. Health Servs., Inc.*, --- F. Supp. 3d ----, ----, 2020 WL 6381395, at *2 (E.D. Pa. Oct. 30, 2020).

Indeed, even prior to *Thole*, the Third Circuit rejected a similar limit on standing. In *Sweda*, the plaintiffs sued with respect to a plan that offered multiple investment "tiers," but the plaintiffs themselves had invested in only some of the tiers. 923 F.3d at 331 n.6, 332 n.7. The Court held that the plaintiffs had standing. The complaint, wrote the Court, alleged that the plaintiffs invested in some of the underperforming options, and "[t]his allegation links the named plaintiffs with the underperforming investment options and is sufficient to show individual injuries." *Id.* at 332 n.7. Here, too, the Fiduciaries concede that the Participants invested in some allegedly high-cost funds, which is sufficient for an Article III controversy.[4]

Finally, *Thole* aside, the Fiduciaries misconstrue the Complaint. The Participants allege that the Fiduciaries mismanaged the Plans. (Compl. ¶¶ 1–13.) The Participants thus allege Plan-wide injuries, and as participants in the Plans, they may sue to course-correct the Plans' management. *E.g.*, *Boley*, 2020 WL 6381395, at *5; *Hay v. Gucci Am., Inc.*, Civ. No. 17-07148, 2018 WL 4815558, at *4 (D.N.J. Oct. 3, 2018). While the Complaint includes details about specific funds, which the Participants may not have invested in, the Complaint does so for "illustrative" purposes. (Compl. ¶ 81, 99.) Those funds are not the be-all-and-end-all of the Participants' claims.

---

[4]     The Fiduciaries contend that the *Sweda* majority was wrong and that Judge Roth's dissent is correct. (Mot. at 28 n.15.) This argument is a non-starter because Judge Fisher's opinion in *Sweda* was joined in full by Judge Shwartz. It is therefore not for me to say that the majority opinion was right or wrong; what is clear is that I am bound to follow it.

For those reasons, I find that the Participants have standing to challenge the Plans' management and thereby bring their ERISA claims.

## B. Duty of Prudence

Turning to the merits, an ERISA fiduciary must exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). ERISA thus imposes a duty of prudence. *Sweda*, 923 F.3d at 328. Pursuant to that duty, "[a] fiduciary must prudently select investments" and "must also understand and monitor plan expenses." *Id.* (citations omitted). That is a process-focused duty; that is, courts look to *how* the fiduciary made its investment decisions. *Id.* at 329.

Whether a fiduciary complied with that duty is an "inherently factual question." *Id.* (citation omitted). At the motion-to-dismiss stage, I must "employ a holistic approach" to determine whether the plaintiff has plausibly pleaded a breach. *Id.* at 331. Because participants usually do not have direct evidence of how fiduciaries reached their decisions, the complaint need only provide an inference of mismanagement by "circumstantial evidence," rather than "direct" allegations of matters observed firsthand. *Id.* at 332 (citation omitted).

The Fiduciaries urge that it is not enough to allege generally that lower-cost investment alternatives exist. (Mot. at 8–16.) This is so, the Fiduciaries say, because "a fiduciary must consider numerous factors besides cost when weighing investment options." (*Id.* at 10.) But a fiduciary's argument that it "did in fact employ a prudent process . . . goes to the merits and is misplaced at this early stage." *Sweda*, 923 F.3d at 333. Rather, the complaint need only plausibly plead that the fiduciary could have reduced costs, and the Court will leave to a later day whether the fiduciary should have done so, considering all the circumstances. *See id.* at 328–29, 332–33.

Here, the necessary allegations are present. The Complaint alleges that (1) expense ratios for some of funds were higher than those for comparable

funds (Compl. ¶¶ 67, 71–75), (2) lower-cost share classes were available for some of the funds (*id.* ¶¶ 76, 80), (3) there were lower-cost alternative funds that also performed better over the long-term (*id.* ¶ 92, 96), and (4) the Fiduciaries' recordkeeper charged other large plans less in recordkeeping fees (*id.* ¶ 109). These allegations that the Fiduciaries could have lowered costs are further made plausible by the allegations that the Plans are of such a size that they could be expected to wield considerable bargaining power. (*E.g.*, *id.* ¶ 10.)[5] These allegations are like those which the Third Circuit found sufficient to state a claim in *Sweda. See* 923 F.3d at 332 ("[Plaintiff] offered specific comparisons between returns on Plan investment options and readily available alternatives, as well as practices of similarly situated fiduciaries . . . ."). And they are nearly identical to allegations which other courts in this Circuit have found plausible and sufficient. *Silva*, slip op. at *6–8; *Pinnell v. Teva Pharms. USA, Inc.*, No. 19-cv-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020); *Nicolas v. Trs. of Princeton Univ.*, Civ. No. 17-3695, 2017 WL 4455897, at *4–5 (D.N.J. Sept. 25, 2017). I, too, find that these allegations state an ERISA claim.

The Fiduciaries' arguments to the contrary are unpersuasive. First, they point to *Renfro v. Unisys Corp.*, 671 F.3d 314 (3d Cir. 2011). (Mot. at 11–13.) There, the plaintiffs challenged "the selection and periodic evaluation of the . . . plan's mix and range of investment options." *Id.* at 326. The plaintiffs broadly took issue with the inclusion of "an array" of certain mutual fund options, and one of their criticisms was that the funds had high fees. *Id.* Otherwise, they did "not challenge the prudence of the inclusion of any particular investment option." *Id.* The Third Circuit held that the plaintiffs had not stated a claim based on the "mix and range of investment options" because there was a "reasonable" "variety of investment options" "with a variety of risk and fee profiles, including low-risk and low-fee options." *Id.* at 327. Put simply,

---

[5] Count 1, breach of fiduciary duties, is asserted against the Administrative Committee, to which Barnabas and the Investment Committee delegated investment choices. For simplicity, I still use "Fiduciaries."

the plaintiffs' claim boiled down to a theory that the plan did not have a good mix of investment options, but when the Court viewed those options and found a "reasonable mix," such a claim would have required more substantiation to be plausible. *Id.* at 327–28.

The Third Circuit further explained and distinguished *Renfro* in *Sweda*. *Sweda* held that the allegations there were sufficient to state a claim because they were more specific than those in *Renfro*. 923 F.3d at 332. The Court emphasized that the complaint drew "specific comparisons" between the plan's options and "readily available alternatives." *Id.* The *Renfro* allegations were, by contrast, conclusory, and they remained at a high level of generality. *See id.*

Moreover, *Sweda* stressed, the focus of the inquiry is on the fiduciary's "conduct in arriving at the investment decision." *Id.* at 332 n.7 (citation omitted). So, by "directly compar[ing] fees on options included in the Plan with readily available lower-cost options," the complaint gave rise to an inference that the fiduciary "frequently selected higher cost investments when identical lower-cost investments were available." *Id.* In *Renfro*, no such straightforward comparison was drawn; plaintiffs asked the Court to infer that the fiduciary had a flawed process, based on the allegation that there was a poor mix of investment options, but the Court perceived that there was in fact a reasonable mix of options.[6]

The allegations here bring this case closer to *Sweda* than to *Renfro*. The Complaint's allegations are more specific and do not broadly take issue with the quality of the Plans' mix of options. Rather, the Participants point to specific ways that the Fiduciaries could have cut costs yet did not. Faced by similarly specific allegations, courts have found that *Renfro* does not require a dismissal. *Pinnell*, 2020 WL 1531870, at *6; *see Silva*, slip op. at *6–8.

---

[6]     To be sure, there are fair arguments that there is little daylight between the allegations in *Renfro* and those in *Sweda*. *Sweda*, 923 F.3d at 346–48 (Roth, J., concurring in part and dissenting in part). But the Third Circuit itself found the distinctions highly significant, and I am bound to follow suit.

The Fiduciaries next attack specific allegations and defend certain practices, relying on out-of-Circuit authority. (Mot. at 16–25.) This approach bucks the Third Circuit's requirement of a holistic inquiry: "The complaint should not be parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Sweda*, 923 F.3d at 331 (quotation marks and citation omitted). As explained, the Complaint's allegations—taken together—create an inference of mismanagement. Further, as Judge Arleo explained, while courts outside this Circuit differ on whether specific investment practices are sufficient on their own to state a claim, the *Sweda* standard may render those cases inapposite to a case making multifarious allegations of mismanagement. *Silva*, slip op. at *7–8; *see also Martin v. CareerBuilder, LLC*, No. 19-cv-6463, 2020 WL 3578022, at *5 n.8 (N.D. Ill. July 1, 2020) (declining to follow a decision from a court in this Circuit because "the circuits have differed on how to deal with some of the nitty-gritty details of Plan design" and the Courts of Appeals employ different ERISA pleading standards). Thus, I do not follow them.

For all these reasons, I find that the Participants have stated a claim for breach of the duty of prudence. To the extent the Fiduciaries seek to dismiss the duty of prudence claim in Count 1, the motion to dismiss will be denied.

## C. Duty of Loyalty

ERISA also imposes a duty of loyalty, in which the fiduciary must act "with an eye single toward beneficiaries' interests." *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (quotation marks and citations omitted); *see also* 29 U.S.C. § 1104(a)(1)(A) (a fiduciary must "discharge his duties with respect to a plan *solely in the interest* of the participants and beneficiaries and . . . for the *exclusive purpose* of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan" (emphases added)). To plead a loyalty claim, courts look for allegations

suggesting that the fiduciary made decisions benefitting itself or a third party. *E.g.*, *Silva*, slip op. at *10; *Nicolas*, 2017 WL 4455897, at *3.[7]

To make that showing, the Participants point to the Complaint's allegations regarding Fidelity's role as recordkeeper. (Opp. at 32.) The Complaint alleges, among other things, that (1) the Fiduciaries used a revenue-sharing model to compensate Fidelity when less expensive fee structures were available and common, (2) the specific revenue-sharing model was particularly disadvantageous to the Participants, and (3) the Fiduciaries never sought out other recordkeepers, for example by conducting requests for proposals. (Compl. ¶¶ 109–17.) Courts have found that revenue-sharing, while not per se improper, can give rise to an inference of breach of the duty to loyalty when combined with other allegations—for example, that cheaper compensation structures were readily available. *See, e.g.*, *Hay*, 2018 WL 4815558, at *7–8; *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1353 (N.D. Ga. 2017). Here, there are enough allegations to show that the Participants could have saved costs had the Fiduciaries chosen a different recordkeeper or compensation plan. This need not imply that the Fiduciaries were not acting solely in the Participants' interests, but it could. *See id.* The Fiduciaries may well be able to show why using Fidelity was reasonable; but as allegations, these suffice.

To the extent the Fiduciaries seek to dismiss the duty of loyalty claim in Count 1, their motion to dismiss will be denied.

---

[7]     The Complaint alleges breaches of the duties of prudence and loyalty in one count. (Compl. ¶ 120.) There is some split in authority over whether a plausible prudence claim allows a loyalty claim to go forward as well. *Compare Silva*, slip op. at *10 (collecting authority for the proposition that "a plaintiff may not simply 'recast' a claim of imprudence as an independent claim of disloyalty"), *with Pinnell*, 2020 WL 1531870, at *3, 6 (calling the duties of prudence and loyalty "twin fiduciary duties" and allowing both claims to go forward after finding that the prudence claim was plausible). It might be theorized that a breach of the duty of loyalty imputes an untoward motive, whereas a breach of the duty of prudence could be either intentional or negligent. Regardless, I find that here there are allegations which raise an inference of an independent breach of the duty of loyalty.

### D. Failure to Monitor

Count 2 alleges that Barnabas and the Investment Committee failed to monitor the Administrative Committee to ensure that it complied with its fiduciary duties. (Compl. ¶¶ 126–31.) Courts recognize that when a fiduciary has and exercises the power to appoint and remove plan administrators, it has the duty to monitor those appointees. *E.g.*, *Silva*, slip op. at *10; *Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 669 (W.D. Pa. 2019); *Howell v. Motorola, Inc.*, 633 F.3d 552, 572–73 (7th Cir. 2011); *In re RCN Litig.*, Civ. No. 04-5068, 2006 WL 753149, at *9 (D.N.J. Mar. 21, 2006); *Coyne & Delaney Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996); *Martin v. Feilen*, 965 F.2d 660, 669–70 (8th Cir. 1992).[8] Courts have been willing to find a failure to monitor claim if the plaintiff has adequately alleged a breach of fiduciary duty claim. *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2017 WL 4358769, at *11 (S.D.N.Y. Sept. 29, 2017); *Tracey v. Mass. Inst. of Tech.*, No. 16-11620, 2017 WL 4478239, at *4 (D. Mass. Oct. 4, 2017); *RCN*, 2006 WL 753149, at *9.[9] The theory would be that, if a plan administrator continually made poor investment decisions, an administrator discharging its duty to monitor should have noticed. Because the Complaint pleads breaches of other fiduciary duties, a failure to monitor claim is plausible.

---

[8]   ERISA does not explicitly impose a duty to monitor. *E.g.*, *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2017 WL 4358769, at *11 (S.D.N.Y. Sept. 29, 2017). But ERISA does not purport to provide an "exhaustive list" of duties; rather, it "incorporates the fiduciary standards of trust law." *Sec'y of Labor v. Doyle*, 675 F.3d 187, 202 (3d Cir. 2012). As a result, courts, borrowing from trust law, have recognized a duty to monitor in ERISA cases. *Cunningham*, 2017 WL 4358769, at *11.

[9]   Some courts have required separate allegations of a failure to monitor. *Silva*, slip op. at *10; *In re Schering-Plough ERISA Litig.*, Civ. No. 08-1432, 2010 WL 2667414, at *7 (D.N.J. June 29, 2010). Even under that standard, the Complaint is adequate. It alleges that Barnabas and the Investment Committee had no monitoring system in place (Compl. ¶ 129(a)), and because such a failure violates regulatory standards of guidance, *see* 29 C.F.R. § 2509.75-8 at FR-17, the allegation is sufficient, *Silva*, slip op. at *10.

To the extent the Fiduciaries seek to dismiss the failure to monitor claim (Count 2), their motion to dismiss will be denied.

## IV.    CONCLUSION

For the reasons set forth above, the motion to dismiss is denied.

A separate order will issue.

Dated: April 13, 2021


/s/ Kevin McNulty

_____
**Hon. Kevin McNulty**
**United States District Judge**

15